People v Tapia (2024 NY Slip Op 04487)

People v Tapia

2024 NY Slip Op 04487

Decided on September 19, 2024

Appellate Division, First Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: September 19, 2024

Before: Kern, J.P., Singh, Scarpulla, Mendez, Higgitt, JJ. 

Ind. No. 3500/16 Appeal No. 2076 Case No. 2018-04329 

[*1]The People of the State of New York, Respondent,
v
Felix Tapia, Defendant-Appellant.

Twyla Carter, The Legal Aid Society, New York (Harold V. Ferguson, Jr. of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Jacob C. Marcus of counsel), for respondent.

Judgment, Supreme Court, New York County (Laura A. Ward, J., at suppression hearing; Daniel Conviser, J., at plea and sentencing), rendered May 29, 2018, convicting defendant of criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree, and sentencing him, as a second felony offender, to an aggregate term of six years, affirmed.
The court properly denied defendant's motion to suppress. At the suppression hearing, Officer Perez [FN1] described defendant's arrest. The hearing transcript, contrary to the dissent's reading, shows that the officers observed suspicious activity. As per Officer Perez's testimony, his attention was first drawn to defendant because he saw defendant "wandering around" and "nervously looking around," which prompted his sergeant to direct the officers to "keep an eye" on defendant.
Further, Officer Perez testified that, in front of the subject motel, he observed defendant speak for a few seconds with a woman Officer Perez knew had been arrested three times for narcotics possession. The two touched hands.
Next, the parties separated and the woman walked for a block or so, turned around, and returned some minutes later. In her absence, defendant reached between his pants and his body. Officer Perez testified that when the woman returned, defendant "pushed something like a small object in her hand." While Officer Perez later clarified that he could not see precisely what was transferred, he saw that defendant placed his hand onto her hand and she then clenched her fist and walked away. When the police approached, the woman threw to the ground the object she had hidden in her fist. Immediately afterwards, both were arrested and placed in handcuffs.
In determining whether probable cause exists in a drug sale case, courts must consider factors such as: "telltale signs" of a drug transaction (for example, an exchange of a glassine envelope for money); whether the area has a high incidence of drug trafficking; the police officer's "experience and training" in drug sale investigations; and "additional evidence of furtive or evasive behavior on the part of the participants" (People v McRay, 51 NY2d 594, 601, 604 [1980]). Another factor to consider is an officer's knowledge of a participant's past involvement in drug crimes (see People v Lynah, 56 AD3d 375, 376 [1st Dept 2008], lv denied 12 NY3d 760 [2009]). Here, in a locale known for drug sales, an experienced officer witnessed a woman who was a known drug user give defendant something, saw defendant put his hands into his pants, and saw defendant touch hands with the woman. Based upon this testimony, the hearing court properly found that the officers had probable cause to arrest defendant. This peculiar interaction between defendant and the woman, under the circumstances, is not susceptible to innocent interpretation.
Consequently, the hearing court properly denied defendant's motion to suppress. We find [*2]no basis to disturb its credibility determinations (see People v Wheeler, 2 NY3d 370, 374 [2004] [noting that a suppression court's credibility determinations are entitled to "great deference"]).
Our dissenting colleague's conclusion that there was no probable cause in this case is premised on a recitation of the facts that is not borne out by the testimony credited by the trial court. Thus, the dissent states that Officer Perez did not see the woman give defendant "any object or any money," yet Officer Perez clearly testified that that he observed the woman say something and "g[i]ve something" to defendant.
Moreover, contrary to the dissent's contention, probable cause can be found despite an officer's inability to identify the object that changed hands (see People v Graham, 211 AD2d 55, 58 [1st Dept 1995] [finding that "(i)n a probable cause analysis, the emphasis should not be narrowly focused on a recognizable drug package or any other single factor, but on an evaluation of the totality of the circumstances"], lv denied 86 NY2d 795 [1995]; see also People v Jack, 22 AD3d 238, 238 [1st Dept 2005] [finding probable cause where a trained and experienced officer observed the defendant, in a known drug area, transfer an unidentified object to another man by placing their cupped hands together and second man was about to hand something to the defendant but stopped upon the officer's approach], lv denied 5 NY3d 883 [2005]).
The dissent relies heavily on People v Messano (41 NY3d 228 [2024]), but that case is readily distinguishable. In Messano, the officer observed the defendant exit the car he was driving and approach another car in a parking lot where he stuck his head through the other car's window several times while talking to the driver (id. at 230). A third car arrived with a driver who was known to the officer from a prior drug arrest; a second officer who was called to assist approached the defendant and the other two men (id.). The second officer looked through the open driver's side window and saw a white substance and rolled dollar bill and then searched the car and recovered narcotics (id. at 230-231). In contrast to this case, in Messano the officer neither saw the defendant give something to one of the men nor did he observe the interaction between the defendant and the known drug user. Again, here, based on the totality of the circumstances, the facts support a finding that the interaction between defendant and the woman was more likely than not a drug sale.[FN2]
We agree with our dissenting colleague that an individual should not be subjected to guilt by association. However, for the reasons outlined above, we conclude that the record supports the suppression court's conclusion that, under the circumstances, the officers had probable cause to arrest defendant.
All concur except Mendez, J. who dissents in a memorandum as follows:

Mendez, J. (dissenting).
 

Defendant appeals from a judgment, convicting him, upon his guilty [*3]plea, of criminal sale of a controlled substance in the third degree, and criminal possession of a controlled substance in the third degree, and sentencing him to concurrent prison terms of six years. On appeal, defendant argues that Supreme Court erred in denying his suppression motion after a Mapp/Dunaway hearing, because he was arrested and searched without probable cause. I agree. Therefore, I would reverse Supreme Court, grant the motion, suppress the evidence, vacate the conviction, and dismiss the indictment. 
On the night of August 10, 2016, Sergeant Sanchez and Officers Perez, Carrero, Figuereo, and Pimentel, members of the police anticrime unit, were working the 5:30p.m. to 1:05 a.m. tour and assigned to surveil the Harlem River Houses in two unmarked vehicles.[FN3] At approximately 8:30 p.m., while eating on their dinner break, Sergeant Sanchez and Officers Perez and Carrero, parked their vehicle, a Nissan Altima with slightly tinted windows, near a fire hydrant approximately 25 feet from 75 Macombs Place, a multistoried motel near the Harlem River Houses, known for prostitution and drug activity.
Officer Carrero was the driver, Sergeant Sanchez sat in the front passenger seat and Officer Perez in the rear seat behind the passenger. As they sat in the vehicle, they noticed defendant, Felix Tapia, standing in front of the motel talking with a woman. Although the officers did not know Mr. Tapia or the woman, or see either do anything suspicious, Sergeant Sanchez told the officers to keep an eye on him.
They had observed Mr. Tapia and the woman talk for approximately 10 to 15 minutes, when they saw a second woman appear, whom Officers Perez and Carrero recognized as Karol Rivera from previous minor drug related arrests.[FN4] Officer Perez, the sole witness at the hearing, stated that no one motioned or called to Ms. Rivera, that she walked up to Mr. Tapia and the other woman, had a quick conversation with Mr. Tapia and quickly touched his hand before walking away.[FN5] Officer Perez did not see Ms. Rivera give Mr. Tapia any object or any money.
Mr. Tapia continued talking to the other woman, and briefly placed his right hand between his pants and his body, midway between his waist area. He pulled his hand out without looking down at it and without appearing to hold anything in it. Officer Perez was not able to see if Mr. Tapia pulled anything out of his pants, since it was a little dark outside. All he was able to see was Mr. Tapia placing his hand midway between his waist area and pulling it back out.
Ms. Rivera returned after approximately two to five minutes and approached Mr. Tapia. They touched hands, Mr. Tapia placed his hand on Ms. Rivera's hand, and she closed her hand and walked away.[FN6] Officer Perez, who at the time only had one week of narcotics training, did not see Ms. Rivera give Mr. Tapia any object or any money and did not see Mr. Tapia give Ms. Rivera any object or any drugs. The People acknowledged that all Officer Perez saw [*4]was a brief touching of hands and Ms. Rivera clenching her fist.[FN7]
Officer Perez testified that Sergeant Sanchez asked Officer Carrero and him, "Would you stop him now or later?" They responded, "Let's do it now." The three officers immediately got out of the car; Officer Perez approached Ms. Rivera and simultaneously Sergeant Sanchez and Officer Carrero approached Mr. Tapia. Officer Perez stated that he moved toward Ms. Rivera and asked her what she had in her hand while he grabbed the wrist of her closed hand. As he did so, she threw something to the ground. He was unable to see what she threw away because it was too dark. He immediately placed Ms. Rivera in handcuffs, searched her bag, and found a crack pipe.
Sergeant Sanchez and Officer Carrero reached Mr. Tapia at the same time Officer Perez stopped Ms. Rivera and handcuffed and searched him before learning what, if anything, Ms. Rivera was holding in her closed hand. The officers found a bag of marijuana on his person, which Mr. Tapia told them he was about to roll and smoke.[FN8]
Officers Figuereo and Pimentel were called to the scene. They arrived approximately two to five minutes later, and Officer Figuereo was asked to search the area where Officer Perez and Ms. Rivera had been standing for the object Ms. Rivera had discarded. Ms. Rivera was placed inside their vehicle to be transported to the precinct after Officer Figuereo had concluded the search. While the search for the discarded object was taking place Mr. Tapia was transported to the precinct by Officer Perez, Sergeant Sanchez and Officer Carrero. The officers and Mr. Tapia had been at the precinct approximately 10 minutes when Officer Figuereo arrived and handed Officer Perez a bag of crack cocaine, which he stated had been recovered from the ground. Mr. Tapia was searched at the precinct by Officer Perez before Officer Figuereo arrived, and recovered a bag of marijuana and money. After Officers Figuereo and Pimentel arrived, they and Officer Perez performed a strip search of Mr. Tapia and additional drugs were recovered.
At the conclusion of the hearing the defense argued that there was no probable cause to arrest Mr. Tapia because at best all Officer Perez saw was a touching of hands. There was nothing about an object, drugs, or money being exchanged. The police had a hunch, jumped the gun, and then backed themselves into a sale to justify the initial approach. The prosecution argued that there was probable cause to arrest Mr. Tapia because the events occurred in a drug prone area, two of the officers knew Ms. Rivera whom they had arrested for drug possession three times, and there was some sort of quick exchange. Officer Perez saw a throwing motion and informed Officer Figuereo who had arrived shortly thereafter. Officer Figuereo was able to recover a bag of crack cocaine and "[a]t that point there was probable cause to arrest Mr. Tapia for selling that bag of crack cocaine to Ms. Rivera." Therefore, the recovery of the bag [*5]of marijuana, the money, Mr. Tapia's cellphone and the strip search at the precinct were all incident to a lawful arrest.
The court denied Mr. Tapia's suppression motion, finding that the People had established the police had probable cause to arrest Mr. Tapia based on their observations at the scene, coupled with their prior knowledge of Ms. Rivera's drug arrests. Accordingly, the court held that the police search of Mr. Tapia was incident to a lawful arrest and that the subsequent searches of Mr. Tapia did not violate his constitutional rights.
It is well established that police may not justify a stop by subsequently acquiring suspicion resulting from the stop, that behavior which is susceptible of innocent as well as culpable interpretation will not suffice to constitute probable cause, and that "innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand" (People v De Bour, 40 NY2d 210, 215-216 [1976]). In De Bour, the Court of Appeals recognized that "any time an intrusion of the security and privacy of the individual is undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity, the spirit of the Constitution has been violated and the aggrieved party may invoke the exclusionary rule or appropriate forms of civil redress" (id. at 217).The Court developed a graduated four-tiered test to evaluate the nature and extent of police conduct toward private citizens during street encounters, which considers whether or not the police action was:
"justified in its inception and whether or not it was reasonably related in scope [and intensity] to the circumstances which rendered its initiation permissible, [bearing] in mind that any inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable as the precipitating and attendant factors increase in weight and competence" (id. at 222-223 [internal citation omitted]).
As established in De Bour, the minimal level of police intrusion is an approach to request information which is permissible when there is some objective credible reason for that interference not necessarily indicative of criminality. It "involves basic, nonthreatening questions regarding, for instance, identity, address or destination" (People v Hollman, 79 NY2d 181, 185 [1992]; see De Bour at 223). The next level is the common-law right to inquire, "activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a [police officer] is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of forcible seizure" (De Bour at 223). Once the officer's "questions become extended and accusatory and the officer's inquiry focuses on the possible criminality of the person approached," the encounter has become a common-law inquiry [*6](see Hollman at 191; De Bour at 223). The third level is activated when a police officer entertains a reasonable suspicion that a particular person has committed, is committing, or is about to commit, a felony or misdemeanor. There the officer is authorized to stop and detain the person, short of arrest. "A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed"(De Bour at 223; see Hollman at 184-185). "Finally a police officer may arrest and take into custody a person when he has probable cause to believe that person has committed a crime, or offense in his presence" (De Bour at 223; see Hollman at 184-185).
In People v McRay (51 NY2d 594 [1980]), the Court of Appeals held that the inference of probable cause may be drawn when "a trained and experienced officer observes the delivery of one or more glassine envelopes- the 'hallmark' of a drug transaction- in an area notorious for narcotics" activity, and once this minimum requirement is met, "it is a question for [the] courts with fact-finding power . . . to find as a fact whether probable cause exists" (id. at 605). The court outlined certain circumstances which, when combined with the exchange of a glassine envelope, may give rise to probable cause: (1) the exchange of money; (2) furtive or evasive behavior on the part of the participants; (3) the area is rampant with narcotics activity (see McRay at 604). Thus, in the McRay trilogy, the court found there was an inference of probable cause to arrest where experienced officers actually saw the defendants passing or receiving glassine envelopes in a high-narcotics area (McRay at 605-606).
In his concurrence in McRay, Justice Fuchsberg suggested that
"the reputation of the particular neighborhood in which illegal conduct happens should not be a significant factor in finding probable cause. Arrests are made of individuals, not of neighborhoods. When we single out the latter, more likely than not congested areas peopled in the main by those who are socially and economically deprived, we subject all its residents, the vast majority of whom are sure to be free of criminal taint, to an immeasurably greater risk of invasion than those who live elsewhere. The inevitable result is a measurable abridgement of the Fourth Amendment's protection against police intrusion conducted without sufficient justification, . . . giving substantial weight to the perceived crime rate of an area may constitute a self-fulfilling prophesy" (McRay at 606-607 [internal quotation marks omitted]).
Applying these principles in People v Wilson (175 AD2d 15 [1st Dept 1991], lv denied 78 NY2d 1015 [1991]), we affirmed Supreme Court's suppression of physical evidence, finding that the officer's observation provided a basis for a minimal intrusion of approaching to request information, but did not rise to [*7]the level of warranting a forcible detention or of probable cause to arrest, when the officer who was looking for a suspect in an unrelated matter saw people walk up to the defendant and hand him money; the defendant then made either hand gestures or handed the individuals a small object, which the officer assumed was cocaine or crack because of the way the defendant handed it over. The police blocked the area with their patrol cars and approached the defendant with guns drawn, searched defendant without any inquiry, and recovered drugs and money. We held that
"a police officer's observation of an exchange between defendant and another individual of an undescribed object and United States currency is insufficient to establish probable cause to arrest defendant. Since [the officer's] observations were susceptible to innocent interpretation, his immediate arrest of defendant was excessive and not based on probable cause. Although the officer knew that the area was a drug prone location, this factor alone cannot serve as the justification for untoward or excessive police behavior against those of our citizens who happen to live, work or travel in what are characterized as 'high crime areas'" (id at 17-18 [internal quotation marks and citations omitted]).
In People v Holmes (81 NY2d 1056 [1993]), the Court of Appeals affirmed our decision to reverse Supreme Court and suppress the evidence. The Court held that an officer who noticed a bulge in the pocket of the defendant who was talking to a group of men near a known narcotics location may have had an objective credible reason to approach the defendant to request information, but the circumstances did not justify the significantly greater intrusion of police pursuit, because "pursuit of an individual significantly impede[s] the person's freedom of movement and thus must be justified by reasonable suspicion that a crime has been, is being or is about to be committed" (id at 1057-1058 [internal quotation marks omitted]). In People v Moore (6 NY3d 496 [2006]), the Court suppressed evidence where the police, acting on a tip of a dispute and a man with a gun, arrived at the scene within minutes. They found no ongoing dispute but saw the defendant, who fit the description, begin to walk away on their arrival. Without any verbal inquiry, they drew their weapons and searched and arrested the defendant. The Court held that police, at most had a common-law right to inquiry based on a founded suspicion, and the forcible detention and frisk of the defendant without reasonable suspicion he had committed a crime was not justified (see id. at 500-501).
In People v Lynah (56 AD3d 375 [1st Dept 2008], lv denied 12 NY3d 760 [2009]), reasonable suspicion to detain and probable cause to arrest was found where, at a drug-prone location, the officer recognized the defendant from a recent investigation into a possible drug transaction. The defendant was holding a plastic bag and counting something. When [*8]he saw the officer, he pushed the bag up his sleeve, and when the officer approached, he secreted it in his pants, and placed it in his buttocks. Upon inquiry, the defendant told the officer that he had drugs (id. at 376). In People v Tinnin (36 AD3d 457 [1st Dept 2007], lv denied 8 NY3d 991 [2007]), reasonable suspicion to detain and probable cause to arrest was found when a trained and experienced officer saw the defendant standing on a corner when a man approached and handed the defendant a sum of money. The defendant later touched hands with the man in a manner that suggested the furtive transfer of a small object. However, before arresting the defendant, the police detained the other man and recovered crack cocaine from his mouth (id. at 458). In People v Graham (211 AD2d 55, 60 [1st Dept 1995] lv denied 86 NY2d 795 [1995]) in a known drug-prone area, police officers observed the defendant make five separate transactions where he exchanged money for a small object, which he removed from a bag. After the fifth transaction the officers approached the defendant, looked inside the bag which contained what they believed to be crack cocaine and arrested the defendant (id. at 56-57). In Graham, we found that the observation of the same exchange five times removed any doubt that the defendant was engaging in a drug transaction, but warned that the observation of one such transaction under those circumstances might leave room for doubt (see Graham at 61).
The officer must observe the telltale signs of a drug transaction, such as the transfer of an object or objects for money, in order to have reasonable suspicion to detain or probable cause to make an arrest (see People v Jones, 90 NY2d 835, 837 [1997]; People v Jack, 22 AD3d 238 [1st Dept 2005], lv denied 5 NY3d 883 [2005]; People v O'Kane, 55 AD3d 315 [1st Dept 2008], lv denied 11 NY3d 928 [2009]). That the events unfold in a known drug area is a factor to be considered, but it is not determinative. Thus, observing a defendant hand a bag containing two small white objects to another before walking away, in close temporal and spatial proximity to the defendant's apprehension, without observing anything that appeared to be money being handled or exchanged, at most, provided reasonable suspicion to detain but not probable cause to arrest (see People v Ayarde, 161 AD3d 630, 631 [1st Dept 2018]). Similarly, the officer's observation of a quick hand-to-hand interaction without some handling of physical property or exchange of currency, does not give rise to probable cause to arrest. "Police officers cannot make an arrest in search of a crime; rather, probable cause to believe that a crime has been committed must exist prior to arrest" (People v Jones, 202 AD3d 821, 825 [2d Dept 2022]).
Mr. Tapia was arrested and searched based on a brief interaction with a known drug user in a known drug area. The observing officer admitted that he was not able to hear what Ms. Rivera said to Mr. Tapia and did not see [*9]an object or money being exchanged by either of them. Their behavior, viewed in totality, was at best equivocal and susceptible of an innocent interpretation, and therefore could not form the basis for reasonable suspicion to believe that defendant had engaged in a crime (see People v Messano, 41 NY3d 228, 235 [2024]), or probable cause to arrest (see People v Holmes, 81 NY2d at 1058; People v Moore, 6 NY3d at 500-501; People v Hernandez, 223 AD3d 751, 754 [2d Dept 2024]; People v Wilson, 175 AD2d at 17). Indeed, the prosecution admitted that the police did not obtain probable cause until Officer Figuereo recovered the object discarded by Ms. Rivera. However, by the time this object was recovered defendant had already been handcuffed, arrested, searched, and transported to the precinct for an additional strip search (see Ayarde at 631).
That Ms. Rivera was a known drug user does not legitimize the officers' intrusion without the requisite reasonable suspicion or probable cause. As the Court of Appeals recently stated, "guilt by association . . . has no place in our jurisprudence" as it is "one of the most odious institutions of history"; "the inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security" (People v Messano, 41 NY3d 228, 234-235 [internal quotation marks and citations omitted]). In Messano, like in this case, the officers engaged in a higher level of intrusion than authorized by the attendant circumstances. That the events unfolded in a drug-prone location, that a known drug user was present, and that the officer believed that a hand-to-hand exchange had occurred was of no moment. As in this case, in Messano, the officer conceded that he never saw anything change hands between the defendant and the other driver. In reversing the defendant's conviction, the Court of Appeals stated, "the officers' observations could not form the minimum showing necessary to establish a reasonable suspicion" (id. at 235 [internal quotation omitted]). Similarly, in this case, the officers' observations cannot form the minimum showing necessary to establish reasonable suspicion or probable cause.
The prosecution acknowledged at the hearing that Officer Perez was not able to see an exchange of objects, drugs, or money, and testified about knowledge obtained after the fact. The prosecution also acknowledged that until Officer Figuereo recovered the discarded object the police did not have any probable cause. The officers lacked reasonable suspicion to detain or probable cause to arrest the defendant based on actions that were at all times innocuous and readily susceptible of an innocent interpretation.
Accordingly, because I believe the judgment of conviction, should be vacated, the motion to suppress physical evidence granted, and the indictment dismissed, I respectfully dissent.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: September 19, 2024

Footnotes

Footnote 1: In addition to the one week of narcotics training noted by the dissent, Officer Perez had also made one hundred drug-related arrests, approximately 10 of which were in the vicinity of the subject motel, which was known for drug sales.

Footnote 2: We note that the dissent posits that, under People v Jones (90 NY2d 835 [1997]), for probable cause to exist, an officer must observe the telltale signs of a drug sale. However, Jones holds that a "telltale sign" is not an "indispensable prerequisite to probable cause" (id. at 837). Whether probable cause exists is fact-specific, therefore the dissent's citation to factually dissimilar cases is unavailing (see e.g. People v Ayarde, 161 AD3d 630, 631 [1st Dept 2018] [finding no probable cause where the "detective did not testify that he observed anything that appeared to be money being exchanged or handled by either of the two men, that there was anything furtive about their behavior aside from the sheer brevity of their encounter, or that the area was particularly drug prone"]).

Footnote 3: Sargeant Sanchez and Officers Perez and Carrero were in one vehicle and Officers Figuereo and Pimentel in the other.

Footnote 4: Officer Perez had arrested her once and issued a Desk Appearance Ticket, Officer Carrero had arrested her twice for misdemeanor drug possession.

Footnote 5: Officer Perez stated that it was approximately five seconds.

Footnote 6: At the hearing, it was not clear from the testimony if they touched the palm of their hands or if Mr. Tapia touched the top of Ms. Rivera's hand. The defense argued that he touched the top of Ms. Rivera's hand and the prosecution did not dispute this.

Footnote 7: The People acknowledge that most of Officer Perez's testimony regarding the transaction was after the fact. 

Footnote 8: There is contradictory information in the felony complaint, wherein Officer Perez wrote, "Upon approaching defendant Tapia, I saw him throw one bag of marijuana onto the ground which he had been holding in his right hand in a public place."